OPINION OF THE COURT
Peter M. Leavitt, J.
Petition is disposed of as follows: Petitioner, United Water New Rochelle, Inc. (hereafter, United Water), is a privately owned public utility which supplies potable water to residents and businesses in Westchester County. Intervenor-petitioner, Village of Briarcliff Manor (hereafter, Briarcliff), is a municipal corporation which, inter alia, supplies potable water to residents and businesses within its borders. Respondent, New York City Department of Environmental Protection (hereafter, DEP), is an agency of respondent, City of New York (hereafter, the City), which oversees and administers the vast State-wide system of rivers, lakes, reservoirs and aqueducts through which the residents and businesses of New York City are supplied potable water.
New York City owns the water which flows through this system because it owns the sources throughout the regions north and west of the City from which the water is drawn. Beginning in the mid-nineteenth century the State Legislature granted the City the right to condemn property for this *243 purpose. Obviously, every source of potable water* which the City acquired eliminated a source which could be used by consumers in other communities. Consequently, the City’s use of its right of condemnation was conditioned upon a concomitant right of access to municipalities which were located at or near the condemned water source, or which municipalities’ access to such source would have been preempted by the City’s ownership. The legislation effectuating this right of access currently appears in section 24-360 of the Administrative Code of the City of New York. It provides, so far as pertinent herein: “a. It shall be lawful for any of the municipal corporations or water districts in the counties of * * * Westchester * * * to take and receive from any of the reservoirs, aqueducts, conduits, streams or pipes of the city a supply of water”.
The Catskill and Croton Aqueducts — both of which carry water to New York City through Westchester County — are but two of the many components which comprise this system, and from which municipal corporations and water districts may “take and receive” water. It has been long established that New York City may not deny applications from such entities to “tap-in” to the system, though it may establish reasonable rules and regulations governing the means by which, and the quantity of, water which is taken. (See, Incorporated Vil. of Cornwall v Environmental Protection Admin., 45 AD2d 297 [2d Dept 1974].) Of course, New York City is entitled to remuneration for any water taken from its system.
In 1937 United Water’s predecessor in interest, the City of New Rochelle, was issued a permit — i.e., contracted — for the provision of water through such “tap-ins” to the Croton and Catskill Aqueducts. In 1959 Briarcliff was issued a like permit for the provision of water through a “tap-in” to the Croton Aqueduct. The Croton Aqueduct remains Briarcliffs primary, and United Water’s secondary, source of potable water, and the provisions of said instruments continue to govern the terms of petitioners’ relationships with the City of New York and its administrative agent, DEP.
One of such contractual provisions, which is also at issue herein, concerns respondents’ obligation — or the absence thereof — to chlorinate the water which flows through the Aqueducts. Due to the necessity that the chlorine be “in contact” with the water for a significant length of time, DEP routinely partially *244 chlorinates water at its source as it is released for the trip south through the Croton Aqueduct. The municipalities and water districts which take water therefrom then perform the final chlorination in their own storage facilities, as do respondents, in holding reservoirs just north, and in the northern parts, of the City.
On or about July 8, 1998, DEP notified Briarcliff and United Water that it intended to shut down the Croton Aqueduct through mid-September 1998. Respondents allege that the shutdown was necessary in order to effect repairs and, simultaneously, to take advantage of the better quality of water which could be provided to its customers from the Catskill Aqueduct at that time of year. Historically, July to mid-September is the peak demand period for the year and, petitioners argue, a prolonged shutdown would pose severe health and safety risks to residents of the communities which they serve. On July 13, 1998, counsel for United Water and respondents appeared before this court on United Water’s application for a preliminary injunction enjoining respondents from shutting down the Croton Aqueduct — or, more specifically, from suspending United Water’s access to potable water flowing through the Aqueduct — pending consideration of its petition seeking permanent injunctions and an order annulling and vacating respondents’ determination to shut down the Aqueduct. The matter was adjourned on consent to July 17, 1998, during which time the parties agreed to explore possible alternatives to a complete shutdown; in the interim respondents agreed to continue to supply potable water through the Croton Aqueduct. On July 17th, BriarclifFs application to intervene was granted without opposition and the parties entered a stipulation, which the court reduced to an order, whereby in essence respondents agreed that a quantity of potable, partially chlorinated water sufficient to meet petitioners’ needs would continue to flow through the Croton Aqueduct during the critical summer months. The schedule for submission of papers in the instant proceeding was adjourned, and was adjourned again thereafter, on consent.
Although the period of peak demand has long since passed, all of the parties seek a judicial determination defining and declaring their respective rights in order that they may avoid conflict, litigation and worse in the future. Moreover, respondents allege that DEP does not have the wherewithal — whether this is a consequence of a deficiency in equipment, technology or expertise — to partially chlorinate at the source only the *245 relatively small volume of water which petitioners require. Thus, in order to effect the repairs for which the shutdown had been planned, but still provide partially chlorinated water for petitioners’ use, DEP avers that the massive volume of potable water which traveled daily past petitioners’ points of access, but was not taken by petitioners, had to be diverted into the East River. Respondents have, therefore, interposed counterclaims seeking, inter alia, recompense for the value of millions of gallons of partially chlorinated water.
Logically, resolution of the issues presented herein should be possible through an examination of the language of Administrative Code § 24-360 and its predecessors, and judicial construction thereof. Unfortunately, this avenue has provided little, if any, guidance. As noted above, the statute simply provides that certain entities may “take and receive” water from the New York City system. Respondents argue that where, as here, the point of access is a “tap-in” to one of its Aqueducts the statute entitles such entity to draw from water flowing past, or to, said point. It does not, however, obligate the City to maintain a constant flow of water from which the entity may draw. Petitioners contend that the right to “take and receive” water from an aqueduct is meaningless if there is no water flowing through the aqueduct to be taken or received.
Incredibly, this pivotal phrase has never been defined in either the statutes, or the reported decisions of the courts, of this State. This court suspects that at the time of the statute’s original enactment, the Legislature did not anticipate that New York City would ever shut down the flow of water to its own residents for a prolonged period. Consequently, the City’s own self-interest would, thereby, ensure an adequate flow of water to serve the needs of communities along the route of such flow. Moreover, the fact that for more than a century no court has apparently been called upon to address this issue would seem to have established the correctness of the underlying hypothesis. However, it is evident from respondents’ submissions herein that the New York City water supply system is interconnected to such a degree that one of its aqueducts could indeed be shut down indefinitely without posing any risk of a dangerous supply shortage for the City’s own needs. Furthermore, the passage of time has, and will probably continue to, necessitate(d) more frequent, more involved and more time-consuming repairs to the older components of the system — e.g., elements of the Croton Aqueduct.
Respondents also argue that petitioners have — literally for decades — failed to pursue or acquire alternative sources of pot *246 able water and respondents are not obligated to provide continuing security against the possible consequences of petitioners’ nonfeasance. Respondents thus assume that petitioners have, or had at some point, a duty — which they failed to fulfill — to acquire such alternative sources. This is, however, a false premise. Any municipal corporation or water district entitled to “tap-in” to the system may, of course, decline to do so, or it may acquire an alternative source whether or not it “taps-in”. But, having “tapped-in”, no such entity is thereafter under any duty to pursue an alternative source. Petitioners had no reason to do so precisely because New York City does indeed have a continuing obligation to entities — like petitioners — which have “tapped-in” to its system. That obligation is but one integrant of the conditions under which the Legislature delegated the State’s eminent domain powers to the City in order to facilitate the latter’s creation of said system. (See, Matter of City of Syracuse v Gibbs, 283 NY 275, 283 [1940]; Incorporated Vil. of Cornwall v Environmental Protection Admin., 45 AD2d 297, supra.) Only the parameters, not the existence, of the City’s obligation are in issue.
Indeed, there is authority to support the proposition that the State’s bestowal of the right of condemnation obligates the City to provide water to qualified municipal corporations and water districts on demand. (Matter of New Rochelle Water Co., 39 NY St Dept Rep 82, 85 [Water Power & Control Commn 1929]; Matter of New Rochelle Water Co., 75 NY St Dept Rep 291, 293 [Water Power & Control Commn 1954].) The sources from which the City draws its water were, after all, held by the State for the benefit of the public at large — including members of the public who reside or do business in the communities which petitioners serve. The State Legislature could not lawfully have granted New York City the privilege of taking water from such public sources — and thereby preempting others from doing so — unless to do so would serve the interest of that public. (See, Matter of City of Syracuse v Gibbs, supra.) Requiring the City to deliver water for distribution to citizens in communities outside its borders would serve such interest. Whereas requiring the City merely to permit such distributors to “tap-in” to its system but draw water only at the City’s whim would be detrimental thereto. Consequently, while support for a construction of “take and receive” which accords with the former is far from conclusive, one which permits the latter necessarily presumes that the Legislature acted in derogation of one of its fundamental mandates.
*247 Yet, language in each of the permits clearly supports respondents’ position, and indicates that the contracting parties were well aware that under the terms thereof the City could, with impunity, shut down the flow of water at any time.
The 1937 permit with the City of New Rochelle provides:

“Interruption of delivery of water

“16. It is understood and agreed that the City of New York shall not be liable to the permittee [i.e., the City of New Rochelle] for any damage, direct or indirect, that the permittee or any of its inhabitants or the inhabitants of any of the communities supplied by it may sustain by reason of the shutting off or interruption of the flow of water or reduction in head in the city aqueduct by an inspection thereof or the making of repairs thereto or for any purposes that the Engineer may deem necessary”.
The 1959 permit with Briarcliff provides:

“Interruption of Delivery of Water

“(20) Attention is called to the likelihood of the shutting down of the New Croton Aqueduct and the cessation of flow therein, and the possibility of such cessation extending over a considerable period of time. It is understood and agreed that the City shall not be held responsible by the Village or its inhabitants for any damage, direct or indirect, that the Village or any of its inhabitants may sustain by the shutting off, cessation, diminution or interruption of the flow of water, for any reason that the Chief Engineer may deem necessary”.
Petitioners argue that these provisions may constitute waivers of liability and “hold harmless” clauses in the event of then-unforseen circumstances, but that the contracting parties did not intend thereby that the City could unilaterally stop delivery of the product which had been contracted for. They ask the court to consider the past practices of the parties over the lives of the agreements; particularly, that the City has never shut down the Croton Aqueduct for more than one full day, and has never scheduled major repairs which would require such a shutdown, during the period involved herein. Respondents do not address the question of shutdowns from mid-July to mid-September in general. They do, however, allege that the Croton Aqueduct has been shut down for extended periods on several occasions over the past 16 years. Also, there is no indication that, during the lives of the agreements, the City has ever before been — as it now claims to be — under a State mandate to complete repairs of like magnitude with a like *248 deadline. Assuming arguendo, however, that the contracting parties did in fact agree that the City would enjoy this option of unilateral termination, nevertheless said provisions cannot be enforced in the circumstances under which this matter was first brought before the court. “Contracts [or parts thereof! are illegal at common law, as being against public policy, when they are such as to injuriously affect, or subvert, the public interests.” (Johnston v Fargo, 184 NY 379, 384 [1906].)
Thus, courts will not enforce or compel the specific performance of a contract where the performance compelled thereby will bring about a result which is detrimental to the public interest. (Beasley v Texas & Pac. Ry. Co., 191 US 492 [1903].) In such circumstances, “the court properly may refuse to be made an instrument for such a result * * * the very meaning of public policy is the interest of others than the parties [to the contract] and that interest is not to be at the mercy of the [parties] alone” (supra, at 498). The amount of water which petitioners can draw from alternate sources— particularly during a peak demand period — is limited, as is their storage capacities. There is, therefore, a substantial possibility that a prolonged shutdown of the Croton Aqueduct during such a peak demand period could pose severe health and safety risks for the communities which petitioners serve. Moreover, as noted above, a finding which permitted the City to do so unilaterally would be contrary to sound public policy. In such circumstances, to the extent that the contracts vest such unfettered discretion in respondents, the City’s option to unilaterally discontinue delivery of potable water to petitioners is invalid and unenforceable. (Compare, Twin City Co. v Harding Glass Co., 283 US 353, 357-358 [1931].)
This determination does not, however, resolve the issue of respondents’ obligations concerning the chlorination of the water which it is bound to maintain in the Croton Aqueduct for petitioners’ use. There is no indication whatsoever that the water which New York City is required to deliver to petitioners as a condition of the State’s delegation of the eminent domain power must be chemically treated as well. Furthermore, unlike the delivery of potable water generally, the chlorination of said water presents a question of cost, not public policy. In other words, if a municipal corporation or water district entitled to do so, “taps-in” to the New York City system it thereby acquires access to a source of potable water which the City had condemned. If, by fortuitous circumstance, the point of access is south of the point at which the City has chosen to initiate *249 chemical treatment then the water taken at the point of access will, of course, also be partially treated. But the cost of treating said water is factored into the price which the City is entitled to charge for the water taken. New York City has no inherent duty to chlorinate the water which it sends through the Croton Aqueduct, or to do so at any particular point in the system. Thus, unlike the obligations to permit access and deliver water, the parameters of respondents’ obligation to chlorinate said water were established by the parties in the terms of their contracts.
The 1937 permit with the City of New Rochelle provides:

“Chlorination

“17. The water supplied through the New Croton Aqueduct is now partially treated with chlorine at the Croton Lake Gate House, but it is understood by the permittee that the water to be taken through the connection at Shaft 14 A will not receive the benefit of additional chlorination given all Croton water at Dunwoodie, to the south of said connection. The City of New York will not assume responsibility for the continuous or complete chemical treatment of the water furnished through the connection for which this permit is granted, and the City of New Rochelle shall install, maintain and operate, at its cost cost [sic] and expense, facilities for the additional chemical treatment of the water, or for filters, as it may desire, or as may be required by the State Department of Health”.
The 1959 permit with Briarcliff provides:

“Qualified Treatment of Water

“(21) The City does not assume responsibility for the continuous, partial or complete application of chemical treatment to the water furnished through the connection. The City shall in no way be held responsible for the quality of water taken through the connection.
“The Village shall install, maintain and operate, at its own cost and expense, any additional plant or equipment for the chemical treatment, sedimentation or filtration of the water, as it may desire, or as may be required by the State Department of Health, to provide at all times a safe and potable water”.
Clearly, respondents have no contractual obligation to chlorinate to any degree the water which is delivered to Briar-cliff. The Briarcliff permit expressly states in clear, unequivocal language that the City is not responsible “for the continuous, partial or complete” chlorination of such water. Just as clearly, however, respondents are contractually obligated to *250 partially chlorinate the water which is delivered to United Water. The United Water permit expressly states in clear, unequivocal language that the water being delivered is “partially treated with chlorine”, but the City is not responsible for the “continuous * * * complete [or] * * * additional chemical treatment of the water”. Respondents argue that the language in the United Water permit absolves the City of an obligation to provide partially treated water continuously. But, such a construction of the word, “continuous”, would be illogical and incongruous in the context of the clause in which it appears. Construed correctly, the word, “continuous”, refers to a degree of chlorination — i.e., from partial to complete — rather than how long a period of time the obligation to chlorinate will continue after the City begins to deliver water.
Finally, since respondents could not unilaterally shut down the Croton Aqueduct for a prolonged period during a peak demand period, and they were contractually bound to partially chlorinate the water made available to United Water in the Aqueduct, they are not entitled to recompense for the value of the water which, they claim, they had to discard in order to fulfill their obligations. United Water derived no benefit from the discarded water, nor was it otherwise unjustly enriched thereby. With respect to United Water, whatever loss respondents have incurred resulted from their own deficiencies, not anything United Water did or didn’t do. Accordingly, for all of the foregoing reasons, respondents’ counterclaims against United Water New Rochelle, Inc., are hereby dismissed.
Respondents had no contractual obligation to partially chlorinate the water made available to Briarcliff, however. Based on its allegations DEP could, apparently, have provided a reduced volume of potable water sufficient to satisfy Briar-cliff’s needs, without significant waste, if it had not been required to partially chlorinate said water. Respondents may, therefore, be entitled to recompense from Briarcliff for some, if not all, of the value of the discarded water. But a special proceeding is not the appropriate judicial vehicle through which such issues should be resolved. Accordingly, since the questions of BriarclifFs liability, and the amount of damages, for the discarded water are the only issues still to be determined herein, this matter is hereby transferred to the Trial Assignment Part, Supreme Court, Westchester County, for whatever further proceedings are deemed appropriate therein.

 As used herein the term “potable water” refers to water drawn from a freshwater source. It does not refer to water which, following chemical treatment, meets State health and safety standards for drinking water.